Good morning, Your Honors. Susan Alexander on behalf of Roofers Local No. 149. So this case was dismissed at the pleading stage, and the crux of the allegations in the complaint is that after Turbo's dismal opening weekend, defendants had access to sufficient information to make their statements that Turbo will be, is, and was profitable, at least deliberately reckless. And so the allegations, the truth of those allegations is central to falsity, scienter, and loss causation. So what I'd like to do, if I may, is direct the Court to three paragraphs of the complaint that make plaintiff's case most clear and reflect why the dismissal was error. Paragraph 52 of the complaint makes clear that the two statements in October were no longer projections. In July, they said Turbo will be profitable, but in October, they said it is profitable and it was profitable. Paragraph 46 has pages of subparagraphs detailing what they knew after the opening weekend, and paragraph 54 has, again, pages of subparagraphs detailing the information defendants knew in October when they spoke, and so I'd like to... Also, I'd just start by telling you where my concern is with your argument, and you can respond to it. I have difficulty seeing falsity because when the statements are taken in their full context, they're couched with so many conditional words that I just have difficulty seeing falsity as distinct from optimism, which is not actionable. Paragraph 52, for example, is just an example of what Judge Draper, I think, is talking about. Based on the information we have today, we believe that Turbo is a profitable movie. We believe that Turbo was a profitable film on an ultimate basis, so there's these qualifying phrases. Right, so there are two phrases there that are really important. We believe, and on an ultimate basis, and I'd like to address both. So the Supreme Court has spoken to we believe in Omnicare. In Omnicare, the Supreme Court said, those magic words, we believe, can preface nearly any conclusion, and the resulting statements, as we have shown, I'm quoting from Omnicare, remain perfectly capable of misleading investors. But you're also leaving out the initial piece, which is based on what we know today. Right. And what they know today is not only that it was a soft opening, but they also have a new distribution. They're no longer with, I forget which platform. They're with a new platform, so they don't really know how it's going to perform, and they're very hopeful that it's going to be a lot better, and it's okay to be hopeful that something is going to work. It's okay to be hopeful, but not, yes. But that's why the phrase, on an ultimate basis, and is profitable, was profitable, is important, because hopes are different than what the accounting rules, which they said they followed, allow them to include in their calculations. So specifically, it's accounting rule ASC 926- Ultimately, they were not faulted for their accounting. I mean, there was... You're talking about the SEC's decision not to pursue an action against them? Yes. So this court in Verifone held that the court can draw no inference, no negative inference from the SEC's decision not to charge defendants, because there are a multitude of reasons, including budget constraints and all sorts of other factors that we don't know about. But we can't draw the opposite inference, either, that there was something fishy. What we do know is the accounting rule required, this is in paragraph 32, 926-2035-5, requires them to only include in their estimates revenue estimates for which they have persuasive evidence or which are based on past experience. So it's one thing to say, what you just said, Judge Graber, we had a soft opening, we're kind of concerned about the theatrical revenues, but we're hopeful because we have this new idea. That is a different statement than based on the estimates that we can draw, based on the information we have now, the film is profitable, or the film was profitable. Those are different statements. And I think that if I can turn to the details, I mean, I can take you through the math in paragraphs 46 and 54, and I don't know if you want to go there or not, but what I can tell you is, by the time they spoke in October, they were looking at, based on the information they had, they were looking at a $200 million hole. Right, but that's why it seems to me crucial that they had made a different arrangement. Because historic information, which is what you rely on in those long paragraphs, you go and say, well, this is what happened in the past, and therefore they had to, to be truthful, apply the same criteria as they had in the past, but they weren't using the same distribution. They were using the same distribution. What they were hoping for, what they were hoping for, as I understand it, And it was also true that they were profitable in some foreign countries. They had begun to, they had begun to receive revenues from the one distributor that was distributing in China and South Korea. That doesn't mean that they had paid down DreamWorks' $127 million production costs. So no, they were not yet profitable. They had paid off the distributor in those countries. That's all that had happened. And that was certainly a very small fraction of the international market. What they were hoping for, as I understand it, if we look at the complaint, frankly, in the light most favorable to defendants, which would be the flip side of the way we should be looking at it, but if we look at it, they're hoping that they're going to do really well in home entertainment and in consumer products. But here's what they know about those two things. So in consumer products, they're looking at, they're behind by about $200 million. That's the hole they're trying to fill. Consumer products in the third quarter of 2013 produced $3.9 million in revenues. That's the information they have. And the home entertainment, what they know, and again, this is in footnote 7 on ER 56. It's paragraph 54B of the complaint. What they know about the home entertainment field is it's going to be just as crowded as the theatrical release, right? So when it opened in the theaters, there were all these other kids' movies at the same time, and so everybody got a smaller piece of the pie. The same thing is going to happen in the home. Or at least they didn't have any reason to think otherwise. Is that your argument? Exactly. No reasonable basis to think otherwise. And so reflecting their hopes as a certainty is exactly what this court held in Reese is actionably misleading. They reflected it as a certainty. I think it's different, though, for them to say, we believe, and what you're really, I think, arguing is based on the information they had today, they didn't have a reasonable basis for a belief. I'm not trying to put words in your mouth, but I am trying to get my arms around your argument. Sure. I mean, I would say that... They had a track record, right? And no reason to think that home entertainment and consumer products were going to be different than they had been in the past, or that something was going to change? They had no reasonable basis that they were going to be, even if they were going to be enough different that they could say with confidence that they were going to make up a $200 million hole, which is how far they were behind. So where did they say with confidence that they thought they were going to make up a hole? Is it we believe it ultimately will be profitable? Is that how you interpret that? So ultimate basis is an accounting term, right? And so it's always, I mean, yes, it is always based on a 10-year estimate. But what they said is, we believe Turbo was a profitable film on an ultimate basis. On an ultimate basis, right. And that accounting rule has really specific provisions for how they're allowed to do that calculation. It's not a, you know, we think it might rain tomorrow sort of thing. Sure. It's not a gut feeling. It's based on really specific numbers. And again, what they're looking at, this consumer product stream, snail toys, brought in $3.9 million in the quarter that, the quarter at the end of which they're talking, saying this and home entertainment, which is going to open up in the same crowded field, are going to cover this huge gap that we've been left because our box office. Before you run out of time, I'd also like to ask you to discuss loss causation, which is another concern I have here. Okay. Can you tell me your concern? Or I can just tell you why I think it's directly related. I mean, the false statements were the movie's profitable. The first revelation in February is that they had to take a write-down. And the second revelation in July is the movie's not profitable. They were absolutely proximately related to the false statements. There's no question. There were other things also said in February and in July. But this court and the Supreme Court are clear that the false statement doesn't need to be, the revelation of the false statement doesn't need to be the sole cause of the loss. It needs to be a substantial cause. And there's no question that the fact that one of their two films caused a write-down, required a write-down, and then wasn't profitable, the opposite of what they had said, were proximately related to their earlier false statements. And again, as to the false statements, I do think I understand what you're saying about the qualifying words. We certainly have the Supreme Court's opinion about whether those qualifying words should let defendants off the hook, particularly at the pleading stage when statements are being viewed in the light most favorable to plaintiffs. But even if, and that's where Reese is important, even if they are opinion statements, Reese makes clear that opinion statements, a statement of belief is a factual misstatement, actionable under Section 10B if there was no reasonable basis for the belief. I'd like to reserve the rest of my time for rebuttal, unless the Court has further questions. You may do that. Thank you. Thank you. May it please the Court, Karen DeMasi on behalf of the appellee's defendants. The District Court correctly dismissed the complaint for three separate and independent reasons, and in doing so, followed faithfully the prior decisions of this Court. This Court can affirm on any one ground, but it should do so on all three grounds, and I'd like to hit each of them quickly and then turn particularly to the issue of falsity. The pleading standards for plaintiffs in a securities fraud action are formidable. Plaintiffs are subject not only to Rule 9B, but also to the heightened pleading standards of the PSLRA, and those standards require specific facts, and facts, Your Honor, are events that happened as of the time the statements were made, actual facts, not conclusions, not speculation, not supposition, not after-the-fact opinions of plaintiffs. What the pleading requirements call for are facts. Here, the complaint is utterly devoid of facts, including the paragraphs that Ms. Alexander just referred to. I'll get to those in a moment. Instead, relying on supposition, speculation, after-the-fact conclusory assertions. There are no contemporaneous facts that support fraud. There are no internal documents. There are no confidential witnesses.  There's simply nothing to suggest that the company's statements about the profitability of the film Turbo at the time they were made and based on the data that they had to date were fraudulent, and the PSLRA simply does not permit this kind of pleading. Let me first talk briefly about loss causation. This case is on all fours square with loose. In fact, it's actually a little bit less than loose in terms of the facts, because in loose, there was an albeit unpleaded subsequent disclosure that the financials couldn't be relied on in a restatement. But in loose, based on what was pleaded, which was simply disappointing financial results, as happened here in February of 2014 with the fourth quarter results and the disclosure of an SEC investigation, neither of those was sufficient to provide loss causation. And here, with respect to the February 2014 announcement of a write-down, the statements are quite clear that that is based on fourth quarter data. The only basis on which the plaintiffs claim that the February 2014 write-down is related to the fraud is by hindsight, is by saying the fact that you didn't take a write-down in the second and third quarter must mean this was fraud because you took it in the fourth quarter. And this Court's precedent squarely rejects fraud by hindsight. With respect to the July 2014 statement, that was a disclosure of an SEC investigation, which likewise did not reveal fraud. And that's loose. It makes that very clear. There is a subsequent decision that the plaintiffs cite in Lloyd, which says that where there is an SEC announcement, an SEC investigation, plus a subsequent disclosure, there could be loss causation. But here, there's nothing, and as Judge Graber already noted, the SEC closed that investigation with no action. The accompanying statement, there are actually two other accompanying statements in July of 2014, one of which Ms. Alexander addressed. First of all, the one the plaintiffs ignore is that there was an unrelated $15 million loss that day. The plaintiffs never addressed that. That was part of the statement, the announcement in July of 2014. The second was the statement that the company did not expect the film to generate any additional profit. But of course, that's not new information to the market. That was already announced to the market in February 2014 when a write-down was taken. That's what a write-down is. It says that the costs are expected to exceed the revenue on an ultimate basis, and therefore, there won't be any profit. So that also can't be loss causation. Before I get to falsity with respect quickly to Sienter, Sienter also requires a heightened pleading standard, a strong inference of Sienter, whether looked at individually or holistically, and both of those analyses are required under TELABS. There is absolutely no motive offered in the complaint relating to why defendants would commit such a fraud. There's no insider trading. There's no compensation benefit. There's no stock options. There's absolutely no reason provided whatsoever, much less facts, that would give a strong inference of Sienter. And I will leave the rest of that to our briefing, which addresses each of the other points, unless your honors have questions. Finally, with respect to falsity, the complaint falls far short of what is required for falsity. To plead falsity, again, what is required is that with respect to each alleged misstatement, the plaintiffs identify with particularity facts, actual events that occurred at the time, facts on which the allegation of falsity is formed. Well, I think, as I understand the argument, the fact is that, I think it's a conceded fact, that Turbo did badly in its opening. And the other facts are how other films did at their opening and how that related to their ultimate profitability. So those are facts that support the allegation that a statement that something was going to be profitable was false and they knew it. So I'm not sure I understand why you think there are no facts. Well, because your honor, those facts are not undisclosed facts. What a fraud is based on is undisclosed facts about which investors are not aware, either because there is an affirmative factual misstatement, as the plaintiffs plead here, or because there is some sort of omission. The facts, the public box office result, which the defendants specifically addressed in their statements about the profitability of Turbo, they specifically identified the bases for why notwithstanding that soft opening, they nevertheless believed as of the second quarter and then again as of the third quarter that Turbo would be profitable. Those facts are public facts that are already incorporated into the stock price, that are known to the market, that are known to investors. And so doing a hindsight analysis... I hate this term, but if the true facts are known to the public, then a false statement isn't false? No, if the true facts are known to the public, a false statement can be false, but an investor couldn't reasonably rely on it because the falsity is already incorporated into the stock price and known to the market. And that's a result of the fraud on the market, efficient market theory that the plaintiffs rely on in paragraph 76 of their complaint. And so what the plaintiffs do here... So you're not saying it's not false. You're saying it may be false, but it's not actionable if the information is already public. That's true, Your Honor. Here it's also there is not falsity because the falsity that would need to be alleged here is facts that show that as of the second quarter 2014... the second quarter, pardon me, 2013, the film was not profitable. And plaintiffs don't offer anything to that effect. They don't offer any internal documents that show that DreamWorks didn't actually conclude that it was profitable based on the data as of the second quarter. They don't have any witnesses that say... confidential witnesses internally saying, actually, we were really worried about the soft opening and didn't think the film was going to be profitable on an ultimate basis. There are no actual specific facts that are pleaded that undermine the statement that the defendants made. And that's what they would need for falsity. Not public facts that were known that are on websites like Box Office Mojo, that are in industry sources that anybody knows and can analyze, and again, that are already baked into the stock price. But facts that undermine the actual conclusion as of the time. With respect to ASC 926, which Ms. Alexander referred to, that standard, which looks at how a company determines film revenue on an ultimate basis, that means over 10 years, there are multiple factors. And those factors are set forth in footnote 4 of our brief on appeal. There are multiple factors. The plaintiffs here, in doing their hindsight analysis, have chosen to look at exactly one, the historical results of other films. But again, in the actual statements, if you look at the statements, in their supplemental excerpt of record, that the court can find them easily, 6 through 20, that's for the second quarter statements, and supplemental excerpt of record 22 through 36, the defendants actually looked at a number of factors and evaluated all of those factors and gave the bases for their conclusion that on an ultimate basis, it was expected as of the second quarter and as of the third quarter that the revenue on an ultimate basis would exceed the cost. The minute that changed, the minute there was new data to suggest that the cost would exceed the revenue, that's when DreamWorks took the impairment, and that was what was announced based on fourth quarter data on February 25, 2014. Was your citation S.E.R. 22 to 36? Yes. Okay, thank you. S.E.R. 22 to 36. I think I just misheard you. Okay, great. I've got it. I may have misspoken. Just to give you an example, if I might, from the second quarter of 2013, before the defendants ever got to their current conclusion, their current assessment that the film was profitable on an ultimate basis, the first thing that Mr. Katzenberg said, and now I'm at S.E.R. 8, was, the film's soft opening is a clear result of an overly saturated marketplace and a difficult release date. And then he goes on to explain some of the factors that caused that soft opening. He then says, that said, we are genuinely proud of Turbo. Together with more summer playing time ahead and the high multiples that DreamWorks movies have historically achieved, I believe there is still upside for Turbo domestically. So he addresses the soft opening. He explains why their conclusion as of that time was still that on an ultimate basis, the revenue would exceed the cost, and goes on to explain other factors, and again, those are set forth with respect to ASC 926 and footnote 4. There are multiple other factors that one looks at in determining revenue. What about this next statement, counsel? It's just in, I think the quote you read had ellipses in it. That said, we are generally proud of Turbo with an A Cinema score and an A-, I think, or to me that means A+, among audiences under 18. And then it says, together with more summer playing time ahead and the high multiples that DreamWorks movies have historically achieved off of their opening weekends, I believe there is still an upside for Turbo domestically. Yes, Your Honor. What's that mean, historically achieved off their opening weekends? So that is referring... High multiples, I don't, there's some lingo there. Yeah, so that's referring, Your Honor, to another of the factors there, again, a number of factors that one looks to in revenues, and one of the things that you can look to is what happens after the opening weekend. So you don't just look to the opening weekend revenue. It could be that on the opening weekend it was rainy, there was a hurricane, there were lots of other movies, as in the situation here, Despicable Me 2 came out, which was a blockbuster. It could be that there was a competition, but after, what this is referring to is that after opening weekend, DreamWorks movies have often achieved multiples that enable them to make up for a slow opening weekend, and that's what this is referring to, which is one of the factors. I think that's actually opposing counsel's very argument, because applying the multiples that had been historic would not get to profitability. That's exactly my question. I think her argument is that looking at their own track record, there wasn't a justifiable reason for optimism here, and I'm paraphrasing, but could you address that point? Sure. So there are other bases on which, again, there are other factors besides opening weekend revenue. One of the things that the plaintiffs look at that is in the complaint relates to other opening weekend revenues and write-downs that were taken, but this film had other factors that one looks at in determined profitability, including a very strong consumer product program, including extremely strong openings internationally. The statements go on to explain that internationally in some of the markets, the movie was actually opening at number one and that it was expected to be very strong and that that could potentially be one of the factors that based on the information, again, that they had of that date, that DreamWorks had concluded that it was profitable. And again, there's no allegation that DreamWorks did not actually believe that at the time or that there was internal data to suggest otherwise. But I'm not sure you're answering the question exactly. Together with more summer playing time ahead, because as of that time of the year, that was right, and the high multiples that DreamWorks movies have historically achieved off of their opening weekends. I think her argument is that that wasn't accurate. Based on their own track record. What are high multiples? It is high revenues coming off of opening weekend that there would be additional revenue to be gained. X is how much you make in your opening weekend and you multiply it by whatever the number is, 20, 300, I don't remember what the numbers are. But historically, if you did X on your opening weekend, you could multiply it by a certain number and that would tell you how much money the movie was going to make. So I think their argument is that if you take what Turbo made on its opening weekend and you multiply it by any of the numbers in the prior movie openings, it never comes out to be enough to make the movie profitable. By historic standards. Now, there are other, as you say, other factors. But I think they're zeroing in on this piece of the action. And again, there are no allegations of specific facts that internally that statement or that basis was untrue. So they don't cite any internal analysis. Well, mathematically it's untrue. That's their point. If you take the multiplier, opening weekend times whatever it was equals ultimate revenue from all the prior movies, that sentence isn't mathematically true is what they're saying. It has nothing to do with belief. It's just as a matter of numbers. It doesn't come out that way arithmetically. And Judge Graber, what I would say to that is that the company under ASC 926, and there's no allegation again that they didn't follow ASC 926, that there are a number of factors of which historical film revenue is one. Well, that's a different question. So, I mean, I think you're a little bit talking past each other because I think the complaint zeroes in on basically one of the factors and said this can't be true as a matter of arithmetic. And what you're saying is, well, even if that is right, there are all these other things that surround it contextually that make the ultimate suggestion that there could be profitability reasonable. And so you're kind of talking past each other, I think. Again, our position would be that the most reasonable inference to be drawn from the statements and all of the language that is contained in the statements and all of the bases that were provided for the conclusion at the time is that in the second and third quarter, based on all the factors and based on the analysis, that is not ever questioned anywhere in the complaint in terms of a factual basis, in terms of actual facts about whether the company disbelieved or had facts internally that undermined their analysis, that based on all of what was stated, the only reasonable inference to be drawn from these statements is that as of the second and third quarter, the company believed that on an ultimate basis, the revenues would exceed the cost and it would be profitable, and that based on fourth quarter data when that changed, the company issued its write-down, and that that's not fraud. That's transparency, Your Honor. Can I ask one other question related to this sentence? Does this mean the phrase high multiples that DreamWorks movies have historically achieved off of their opening weekends, is that a comparison of DreamWorks to DreamWorks historically, or is it a comparison of DreamWorks' historic performance compared to its competitors? How should I read that? Your Honor, I think that the factors of ASC 926 would look at all of those, and it would also look at the other movies that were released simultaneously in a saturated market on the opening weekend, but I think historically what, and based on the multiple factors, what ASC 926 would look at is all movies. I mean, it would look holistically at a variety of data and factors that would determine. Again, you're just really not answering my question. If you could go to this statement, I'm trying to figure out what this statement meant. Maybe I'm not asking it very clearly, but you see the sentence I'm pointing to? I do see the sentence you're pointing to, and I think that they're talking about their own movies and the high multiples achieved off of those movies over time, not just the movies that the plaintiffs... Compared to, that's the point. Compared to other DreamWorks... Compared to other DreamWorks movies as well. Thank you. Sure. Thank you, counsel. Thank you, Your Honor. Ms. Alexander, you have some more time. I agree. I think it's DreamWorks against DreamWorks, and I want to just step back and walk through the math a little bit because I actually do think it's important. So what multiples means is there are historical numbers, and it's one of the factors, and it is the factor that was public. What they know is there's a percentage of box office opening weekend gross receipts to domestic sales and to international sales. So based on how they do on the opening weekend, they can extrapolate best case, right? The best case is that... So opening weekend was $21.3 million. Based on films since 2011, the best case was that was going to represent 22 percent, the smallest amount, right, of the total. 22 percent of the total domestic. So even if you assume... Because, and the reason that's... Is your argument the reason that was the best realistic estimate is because that was their track record? Their track record of all films since 2011, if they looked at once we do this in opening weekend, how much better can we do? Their historical basis was domestic was going to be $100 million. International sales, so it's not outside of the historical revenue. International is part of what's considered, in the math, 230. So there are 330 gross revenues. There's an important point here that I think is clear in the briefs, but I want to make sure. DreamWorks revenue stream comes from the distributors. So 330 million gross revenues at the theaters means distributors take approximately 50 percent domestically and 40 percent internationally. The rest stays with the theaters. So they're not working with the 330 number. They're working with 100... That best case number that they could reasonably assume in July after the opening weekend that yields 330 in gross revenues gets $142 million to the distributors who are owed somewhere between 170 and 195. So they're behind in paying off the distributors and until distributors are fully paid, not a dollar goes to DreamWorks, and they have production costs to be paid off. I think there was an important point here on where we're talking past each other, the difference between what's publicly known and what's known within DreamWorks. Yes, I wanted to ask you about that because what is your response to counsel's point that if information is already in the public domain, it doesn't count as actionable if everybody in the world already knows that they had a bad opening weekend, they can also do the math? Right, so they can do the math, but I think it's where this Court's decision in Hannon comes into play and these sort of fuzzy factors that they throw out become crucial, and it's why their statements are so deliberately, recklessly misleading, because everybody can do the math. So what they say is, it's all right, we're going to make it up in consumer products and home entertainment. But what they know, they have no reasonable basis for that, and that's exactly the reason that this complaint states a claim. There is no reasonable basis to say consumer products and home entertainment, we're going to make up $200 million of a whole because they know in the third quarter consumer products pulled in $3.9 million, and they know that the home entertainment field is just as crowded, first of all is taken as a percentage, is typically taken as a percentage off opening weekend box office gross, but it's opening in the same crowded field that the theatrical release opened. But that's also known publicly. Everybody knows that Despicable Me 2 is out there, it's not a secret, and all the other films that were geared towards children and their adult friends. Right. I mean, the reason Hannon says investors are reasonably justified in listening to insiders, because you've got to assume insiders know something, and it turns out... Right, but to the extent that you're saying, well, they should have realized this because it was a crowded field, every investor also knew that it was a crowded field. That's true. But investors are entitled to assume when the CEO and the CFO say, based on the information we're looking at, based on the data that we have, the estimates that we have, consumer goods and home entertainment are somehow making up this gap so that this film... Counselor, your argument would be stronger if you had some kind of a connection to an incentive to mislead the public. And sometimes we have that. In some cases, there are stock advantages or there are end-of-the-year bonuses or something else. And sometimes we have confidential informants or others who have disgruntled former employees who are not confidential who are happy to come forward and say, yeah, this was a sinking ship and they should have known it. I just didn't see any of that here. You're right. And the argument would be stronger... The best that you had was you had a couple of company officials who left, but there was absolutely no connection there. I mean, it looks like it's coincidental. You haven't alleged anything that was... I would say... ...other than a coincidence. I would say, looking at it in the light most favorable, the fact that the chief marketing officer leaves right after the film turns out to have a terrible opening weekend, and the fact that the chief accounting officer leaves right after they announce the write-down and just before the SEC investigation, viewed in the light most favorable to us, might be more than a coincidence. But I think that you're absolutely right. We don't have a motive. We don't have a confidential witness. We don't have a smoking gun. And, you know, Judge Posner for the Seventh Circuit said... He's got that great quote, right? It's like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they're discovered to be missing. It happens, frankly, a lot, where it's a bad quarter, but if we cover it up, maybe by next quarter it will be better. That's not being candid with investors,  which states a claim. Thank you, counsel. Thank you, Your Honors. The case just argued is submitted, and we appreciate the very interesting and helpful arguments from both counsel.
judges: Graber, Bybee, Christen